O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| J-M MANUFACTURING CO., INC., D/B/A JM EAGLE, a Delaware corporation,<br><br>       Plaintiff,<br><br> vs.<br><br>AFFILIATED FM INSURANCE COMPANY, a Rhode Island corporation,<br><br>       Defendants. | Case No. 2:19-cv-05550 MEMF SKx<br><br>**ORDER DENYING PLAINTIFF'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT [ECF NO. 138-1], GRANTING IN PART DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT [ECF NO. 131], AND GRANTING PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE [ECF NO. 146]** |

Before the Court are the Second Motion for Partial Summary Judgment filed by Plaintiff J-M Manufacturing Company, Inc. (ECF No. 138-1), Renewed Motion for Partial Summary Judgment filed by Defendant Affiliated FM Insurance Company (ECF No. 131), and Request for Judicial Notice filed by Plaintiff J-M Manufacturing Company, Inc. (ECF No. 146). For the reasons stated herein, the Court DENIES the Second Motion for Partial Summary Judgment filed by Plaintiff, GRANTS IN PART the Renewed Motion for Partial Summary Judgment filed by Defendant, and GRANTS the Request for Judicial Notice filed by Plaintiff.

/ / /

/ / /

## I.     **Background**

### A.  Factual Background

Plaintiff J-M Manufacturing, Inc. ("JM Eagle") manufactures high-grade, high-performance plastic pipes. JM Eagle took out an "all risk" property insurance policy with Defendant Affiliated FM Insurance Company ("AFM") for the period from November 1, 2016, to November 1, 2017 (the "Policy"). This dispute concerns whether or not the Policy covers losses suffered by JM Eagle in August 2017 due to damage caused by Hurricane Harvey.

### B.  Procedural History

On May 28, 2019, JM Eagle filed this action in the Superior Court of California, County of Los Angeles, alleging claims for breach of contract, tortious breach of the implied covenant of good faith and fair dealing (referred to herein as the "bad faith claim"), and declaratory relief. ECF No. 1-1 ("Initial Complaint" or "Initial Compl.") at 3. In support of JM Eagle's bad faith claim, the Initial Complaint alleges that

> AFM acted in bad faith and in conscious disregard of JM Eagle's rights by, among other things,
>
> (a) Failing and refusing to pay for the vast majority of JM Eagle's losses suffered as described above;
> (b) Failing and refusing to pay for the amounts that JM Eagle reasonably spent to reduce its losses, even though the Policy require[s] JM Eagle to "mitigate" its losses and both the Policy and common law obligate AFM to pay JM Eagle for amounts that JM Eagle reasonably incurred in an effort to mitigate loss;
> (c) Asserting grounds for disputing coverage that it knows are not supported by, and are contrary to, the terms of the Policy, the law, insurance industry custom and practice, the parties' course of dealings, and the facts;
> (d) Failing to conduct an adequate investigation of JM Eagle's losses, and asserting grounds for disputing coverage based on its inadequate investigation;
> (e) Failing to fully inquire into possible bases that might support coverage for JM Eagle's losses;
> (f) By giving greater consideration to its own interests than JM Eagle's interests; and
> (g) By otherwise acting as alleged above.

*Id.* ¶ 39. JM Eagle's Initial Complaint did not explicitly distinguish between the two relevant sources of its bad faith claim—namely its bad faith claim with respect to the refusal to pay all of the losses associated with its Wharton, Texas, facility, on the one hand ("Wharton Bad Faith Claim"), and its bad faith claim with respect to the refusal to pay all of losses alleged to be the result of disruptions to

its supply chain ("Supply Chain Bad Faith Claim"). On June 26, 2019, AFM removed the action to federal court. ECF No. 1.

On January 22, 2021, the parties filed Cross-Motions for Partial Summary Judgment. ECF Nos. 34, 37. On July 6, 2021, the Court issued an Order concluding, in relevant part, that: (1) the business interruption that JM Eagle suffered (arising from supply chain interruptions) was due to one occurrence—Hurricane Harvey; (2) the Wind and Hail deductible applies in cases where "there is damage caused by wind, rain, *or* wind and rain together"; and (3) JM Eagle's claimed supply chain losses are subject to the Policy's $2,000,000 "Other Location" sub-limit for business interruption losses." ECF No. 87 ("MSJ Order") at 12, 15. The Court further distinguished between the Wharton Bad Faith Claim and the Supply Chain Bad Faith Claim. *See* MSJ Order. The Court granted AFM's Motion with respect to both aspects of JM Eagle's bad faith claim. *Id.* at 22. With respect to the Wharton Bad Faith Claim, the Court stated:

> The Court concludes as a matter of law that AFM Insurance did not withhold payments in bad faith. The Court therefore **GRANTS the AFM Motion with respect to the purported withholding of payment for damage at the Wharton facility**.

*Id.* (emphasis added). With respect to the Supply Chain Bad Faith Claim, the Court stated:

> . . . [AFM's] investigation into the supply-chain losses remains ongoing, as JM Eagle's counsel conceded at oral argument. Thus, JM Eagle cannot make out a claim for bad faith in connection with the supply-chain payment. The Court therefore **GRANTS the AFM Motion with respect to bad faith in connection with the supply-chain payment, without prejudice to JM Eagle making this claim again at the close of [AFM's] investigation into all seven [resin] suppliers**.

*Id.* at 21 (emphasis added). The Court briefly discussed the remaining allegations related to JM Eagle's bad faith claim in a footnote:

> **JM Eagle alleges in its Complaint a plethora of other potential breaches of the implied covenant of good faith and fair dealing, but in the instant Motions JM Eagle briefs only those two potential breaches.** With respect to other breaches asserted or implied in JM Eagle's Complaint, the Court concludes that **JM Eagle can prove no set of facts demonstrating any such other breaches and GRANTS the AFM Motion with respect to all other purported bad faith acts.**

*Id.* at 20 n.69 (emphasis added) (citations omitted).

On August 26, 2021, JM Eagle filed a First Amended Complaint. ECF No. 96 ("FAC"). The FAC alleged the same facts with respect to JM Eagle's bad faith claim.

On October 15, 2021, JM Eagle filed a Motion for Reconsideration of the Court's MSJ Order. ECF No. 99 ("Reconsideration Mot."). In its Motion for Reconsideration, JM Eagle contended that reconsideration of the Court's order regarding both aspects of its bad faith claim—with respect to the Wharton Facility losses and the Supply Chain losses—was warranted on the grounds that JM Eagle had discovered new material facts regarding both aspects of its claim. Reconsideration Mot. at 1–3.

On February 9, 2022, the Court issued an order granting JM Eagle's Motion for Reconsideration. ECF No. 105 ("Reconsideration Order"). At the outset, the Court described the issues for decision as follows:

> JM Eagle moves for reconsideration of the MSJ Order's grant of partial summary judgment to AFM Insurance on (1) JM Eagle's bad-faith claim **relating to the supply chain payment**; and (2) JM Eagle's prayer for punitive damages.

Reconsideration Order at 4 (emphasis added). The Court went on to state:

> **[B]ecause AFM Insurance's investigation into seven suppliers regarding supply chain losses was ongoing when this Court issued its MSJ Order, this Court explicitly invited JM Eagle to make its bad-faith claim again at the close of that investigation.** JM Eagle has complied with the Court's Order and makes the instant Motion after discovering—through depositions—new, material facts that could not have been reasonably elicited earlier in the litigation. . . .
>
> JM Eagle contends that the Court should reconsider its grant of summary judgment to AFM Insurance **with respect to bad faith in connection with the supply-chain payment. With AFM Insurance's investigation into JM Eagle's supply-chain losses now complete, AFM Insurance has taken a coverage position concerning the supply-chain payment:** AFM Insurance has concluded that JM Eagle suffered no business interruption losses due to the post-Hurricane Harvey shutdown of JM Eagle's Wharton, Texas, facility. . . .
>
> . . . .
>
> Here, JM Eagle contends that **AFM Insurance has acted in bad faith by delaying payment of supply chain benefits.** Particularly, JM Eagle asserts that new evidence elicited from depositions demonstrates that AFM Insurance **unreasonably relied on the 2021 report of AFM Insurance's expert, Conrad Biegel,** to deny coverage for JM Eagle's business interruption losses. . . .

. . . .

      **Based upon [evidence uncovered from the depositions of Adam Rucker and Brian Cook],** the reasonableness of [AFM's] reliance on its expert's conclusion is disputable and thus—at a minimum—a question of fact for the jury, therefore precluding summary judgment on that issue. . . .

. . . .

For the foregoing reasons, the Court hereby ORDERS as follows:

1.  JM Eagle's **Motion for Reconsideration is GRANTED with respect to (a) bad faith in connection with the supply-chain payment**; and (b) punitive damages.

2.  **The Court's July 6, 2021, dismissal of JM Eagle's bad-faith claim** and related prayer for punitive damages **is thereby RESCINDED.**

3.  JM Eagle is DIRECTED to file no later than February 25, 2022**, a supplemental complaint setting forth its bad-faith claim**. . . .

*Id.* at 5–7, 9 (emphasis added). The next day, pursuant to an Order of the Chief Judge, the case was reassigned to this Court. ECF No. 106.

On February 25, 2022, JM Eagle filed a Second Amended Complaint. ECF No. 110 ("SAC"). JM Eagle's SAC sets forth new allegations regarding the Bad Faith Claim as it relates to the Wharton facility, including, in relevant part:

AFM **incorrectly and unreasonably** has asserted that **the vast majority** of JM Eagle's losses arising out of the damage at its Wharton plant are subject to the Policy's $5,000,000 sublimit for "Flood" at the Wharton location. AFM has taken this position . . . . even though:

. . .

      **(e) AFM's only purported "support" for its positions are illogical, superficial, and unreasonable expert analyses that AFM knows, or should know, are contrary to the facts and defy common sense . . . .**

**With respect to JM Eagle's losses arising from non-flood damage at Wharton, AFM incorrectly and unreasonably has contended that such losses resulted from the "direct action of wind including substance driven by wind" and, accordingly, are subject to the Policy's "Wind and Hail" deductible.**

**. . . [In concluding that JM Eagle suffered no business interruption loss at its Wharton facility], AFM wrongfully and unreasonably has adopted and relied on illogical, superficial, unreliable, and unreasonable "expert" analyses performed by its consultants.**

*Id.* ¶¶ 28, 28(e), 29, 31 (emphasis added). The remainder of the SAC contains allegations regarding JM Eagle's bad faith claim that are substantially similar to those made in its initial complaint and FAC, with the exception of one new allegation:

> AFM acted in bad faith and in conscious disregard of JM Eagle's rights by, among other things,
>
> . . .
>
> **(d) Unreasonably adopting and relying on illogical, superficial, unreliable, and unreasonable expert analyses that AFM knows, or should know, are contrary to the facts and defy common sense . . . .**

*Id.* ¶ 41 (emphasis added).

On March 12, 2022, AFM filed a Motion to Strike the SAC allegations unrelated to AFM's reliance on its expert in denying the supply chain claim, arguing that: (1) the only claim reinstated by the Reconsideration Order relates to AFM's reasonableness in relying on its expert's conclusions when denying the supply chain claim (i.e. the Supply Chain Bad Faith Claim); and (2) AFM would be prejudiced by being forced to again defend against all other bad faith allegations that had previously been dismissed. ECF No. 114 ("Motion to Strike" or "Mot. to Strike") at 8–13. The Court held oral argument on the Motion to Strike on April 14, 2022. However, before the Court issued an order on the Motion to Strike, the parties filed a Joint Stipulation regarding JM Eagle's Bad Faith Claim on May 10, 2022. ECF No. 124 ("Bad Faith Stipulation" or "Bad Faith Stip"). The Court denied the Bad Faith Stipulation, finding it improper to allow the parties to purport to interpret the Reconsideration Order while also conceding that they disagree as to the proper interpretation of the Order and reserving their rights to appeal that Order. ECF No. 127. On July 7, 2022, the parties filed an Amended Stipulation regarding JM Eagle's Bad Faith Claim. ECF No. 144 ("Amended Bad Faith Stipulation" or "Amend. Bad Faith Stip"). On September 12, 2022, the Court granted the Amended Bad Faith Stipulation, ordering:

> 1. JM Eagle's **bad faith claim and related prayer for punitive damages** consists of allegations concerning (1) the **reasonableness of AFM's initial and continued reliance on the opinions of its forensic accounting expert Conrad Biegel of Matson Driscoll & Damico set forth in his report dated May 4, 2021, and any subsequent opinions, with respect to JM Eagle's claimed business interruption losses arising from property damage at its Wharton, Texas, facility;** and (2) the

**reasonableness of AFM's investigation, handling, and adjustment of JM Eagle's claimed supply chain losses, including as set forth in the adjuster's letter dated May 18, 2021**. All other allegations of bad faith, including allegations based on AFM's application of the policy term "occurrence," remain dismissed.

2. AFM's **Motion for Summary Judgment** (ECF No. 34) with respect to the Wharton Bad Faith Claim and any associated punitive damages—which Judge Holcomb granted in his MSJ Order—is hereby **withdrawn**.

3. AFM's pending **Motion to Strike** (ECF No. 114) is hereby **withdrawn**.

ECF No. 172 ("Amended Bad Faith Stipulation Order" or "Amend. Bad Faith Stip. Order") (emphasis added).

On June 16, 2022, JM Eagle filed the instant Second Motion for Partial Summary Judgment ECF No. 138-1 ("JME Mot."). The JME Motion was fully briefed on July 28, 2022. ECF No. 141 ("JME Mot. Opp'n"); ECF No. 165 ("JME Mot. Reply"). On June 16, 2022, AFM filed the instant Renewed Motion for Partial Summary Judgment. ECF No. 131 ("AFM Mot."). The AFM Motion was fully briefed on July 28, 2022. ECF No. 145 ("AFM Mot. Opp'n"); ECF. No. 159 (AFM Mot. Reply"). On September 15, 2022, the Court held oral argument on the cross-motions and took the matters under submission. ECF No. 173.

## REQUEST FOR JUDICIAL NOTICE

### I.     Applicable Law

A court may take judicial notice of facts not subject to reasonable dispute where the facts "(1) [are] generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b). Under this standard, courts may take judicial notice of "*undisputed* matters of public record," but generally may not take judicial notice of "*disputed* facts stated in public records." *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1125–26 (9th Cir. 2002).

### II.     JM Eagle's Unopposed Request for Judicial Notice

JM Eagle submits—and asks the Court to take judicial notice of—facts set forth in two (2) National Climate Reports and thirteen (13) news articles concerning Hurricane Harvey in support of its Partial Motion for Summary Judgment:

1.  National Oceanic & Atmospheric Administration's (NOAA) National Centers for Environmental Information, S*tate of the Climate: National Climate Report - August 2017*, https://www.ncdc.noaa.gov/sotc/national/201708 (last visited Jan. 25, 2023) (Exhibit A);

2.  Eric S. Blake & David A. Zelinsky, Nat'l Hurricane Ctr., *NOAA National Hurricane Center's Tropical Cyclone Report: Hurricane Harvey* (May 9, 2018), https://www.nhc.noaa.gov/data/tcr/AL092017_Harvey.pdf (Exhibit B);

3.  Jim Johnson, *Full Impact of Harvey on Ethylene Market Uncertain*, PLASTICS NEWS (Sept. 13, 2017), https://www.plasticsnews.com/article/20170913/NEWS/170919963/full-impact-of-harvey-on-ethylene-market-uncertain (Exhibit C);

4.  Mariana Cid De Leon Ovalle, *Ethylene Production Crushed by Hurricane Harvey*, THE BOSS MAGAZINE, https://thebossmagazine.com/ethylene-production-hurricane-harvey/ (last visited Jan. 25, 2023) (Exhibit D);

5.  Jack Kaskey, *Harvey Has Made the World's Most Important Chemical a Rare Commodity*, Bloomberg Businessweek (Aug. 31, 2017), https://www.bloomberg.com/news/articles/2017-09-01/world-s-most-important-chemical-made-rare-commodity-by-harvey#xj4y7vzkg (Exhibit E);

6.  Jack Kaskey, *Hurricane Harvey Has Endangered the Supply of the World's Most Important Chemical*, INDEPENDENT (Sept. 1, 2017), https://www.independent.co.uk/news/business/news/hurricane-harvey-ethylene-supply-endanger-chemical-world-most-important-gulf-detroit-car-parts-walmart-a7923551.html (Exhibit F);

7.  Chelsea Gohd, *Most Important Chemical in the World in Short Supply in the Wake of Hurricane Harvey*, FUTURISM (Sept. 2, 2017), https://futurism.com/most-important-chemical-in-the-world-in-short-supply-in-the-wake-of-hurricane-harvey (Exhibit G);

8.  Nigel Davis, *INSIGHT: Hurricane Harvey Impact Leads to 50,000 Tonnes/Day Ethylene Loss*, INDEPENDENT COMMODITY INTELLIGENCE SERVICE (Sept. 4, 2017),

https://www.icis.com/explore/resources/news/2017/09/04/10139856/insight-hurricane-harvey-impact-leads-to-50-000-tonnes-day-ethylene-loss/ (Exhibit H);

9. Tom DiChristopher, *Harvey Has 'Paralyzed' a Critical Part of US Manufacturing Supply Chain*, CNBC.COM (Sept. 6, 2017), https://www.cnbc.com/2017/09/06/harvey-has-paralyzed-a-critical-part-of-the-us-manufacturing-chain.html (Exhibit I);

10. Joseph Bonney, *Hurricane, Floods Cripple Texas Ports, Freight Networks*, JOC.COM (Aug. 27, 2017), https://www.joc.com/trucking-logistics/logistics-industry-feels-impact-texas-hurricane-floods_20170827.html (Exhibit J);

11. *Hurricane Harvey's Impact on Rail Service Continues*, PROGRESSIVE RAILROADING (Aug. 28, 2017), https://www.progressiverailroading.com/rail_industry_trends/news/Hurricane-Harveys-impact-on-rail-service-continues--52571 (Exhibit K);

12. Paul Scott Abbott, *Railroads* Rebounding from Harvey Impacts, AM. J. TRANSP. (Sept. 5, 2017), https://www.ajot.com/insights/full/blog-railroads-rebounding-from-harvey-impacts (Exhibit L);

13. Ron Sterk, *Hurricane Harvey, CSX Problems Dominate Transportation Picture*, WORLD-GRAIN.COM (Oct. 10, 2017), https://www.world-grain.com/articles/8771-hurricane-harvey-csx-problems-dominate-transportation-picture (Exhibit M);

14. Hayley Enoch, *Railroads Still Recovering from Hurricane Harvey*, TRAINS.COM (Aug. 31, 2017), https://www.trains.com/trn/news-reviews/news-wire/30-bnsf-tropical-storm-harvey-impacting-operations-in-southeastern-texas/ (Exhibit N);

15. David Briginshaw, *Tropical Storm Harvey Causes Major Rail Disruption*, RAIL J. (Aug. 30, 2017), https://www.railjournal.com/freight/tropical-storm-harvey-causes-major-rail-disruption/ (Exhibit O).

ECF No. 146. As an initial matter, the Court notes that the Request for Judicial Notice appears to be unopposed. Courts may take judicial notice of information "made publicly available by government entities." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010). As a result, the Exhibits A and B fall within the category of public records that courts have deemed proper for

1  judicial notice, as they were published by a government entity—in this case, the National Oceanic

2  and Atmospheric Administration. The Court therefore GRANTS the Request for Judicial Notice

3  with respect to Exhibits A and B and takes notice of the fact that Hurricane Harvey caused damage

4  in several cities and states over a period of more than a week.

5      JM Eagle further requests that the Court take judicial notice of the fact that "[t]he supply of

6  ethylene and other raw materials necessary to plastic production was constricted by Hurricane

7  Harvey," as allegedly supported by Exhibits C–I. JM Eagle also requests that the Court take judicial

8  notice of the fact that "[r]ailroad tracks throughout the Gulf region, and especially throughout Texas,

9  were damaged by rain and flood from Hurricane Harvey," as allegedly supported by Exhibits J–O.

10  The Court finds that judicial notice of such facts is appropriate, as these facts would be "generally

11  known" and "would be capable of sufficiently accurate and ready determination." *Ritter v. Hughes*

12  *Aircraft Co.*, 58 F.3d 454, 458–59 (9th Cir. 1995). The Court therefore GRANTS the Request for

13  Judicial Notice with respect to Exhibits C–O.

## MOTIONS FOR SUMMARY JUDGMENT

**I.     Applicable Law**

**A. Motions for Summary Judgment**

17      Summary judgment should be granted if "the movant shows that there is no genuine dispute

18  as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P.

19  56(a). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists &*

20  *Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*,

21  477 U.S. 242, 248 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could

22  return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

23      Under Rule 56(a), a court also has authority to grant *partial* summary judgment, or

24  "judgment on less than the entire case." 10B Charles Alan Wright & Arthur R. Miller, *Federal*

25  *Practice and Procedure* § 2737 (4th ed. 2022) (citing FED. R. CIV. P. 56(a)). Under Rule 56(g), a

26  court that "does not grant all the relief requested by the motion . . . may enter an order stating any

27  material fact . . . that is not genuinely in dispute and treating the fact as established in the case." FED.

28  R. CIV. P. 56(g).

A court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). "A moving party without the ultimate burden of persuasion at trial—usually, but not always, a defendant—has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). To carry its burden of production, the moving party must either: (1) produce evidence negating an essential element of the nonmoving party's claim or defense; or (2) show that there is an absence of evidence to support the nonmoving party's case. *Id.*

Where a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial. *Id.* at 1102–03. In such cases, the nonmoving party may defeat the motion for summary judgment without producing anything. *Id.* at 1103. However, if a moving party carries its burden of production, the burden shifts to the nonmoving party to produce evidence showing a genuine dispute of material fact for trial. *Liberty Lobby*, 477 U.S. at 248–49. Under these circumstances, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is no genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks omitted). If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the motion for summary judgment shall be granted. *Id.* at 322 ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co.*, 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, there must be specific, admissible evidence identifying the basis for the dispute. *See id.* "If a party fails to properly support an assertion of fact or fails to properly

11

address another party's assertion of fact . . . the court may . . . consider the fact undisputed." FED. R. CIV. P. 56(e)(2). The Court need not "comb the record" looking for other evidence; it is only required to consider evidence set forth in the moving and opposing papers and the portions of the record cited therein. *Id.* 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Liberty Lobby*, 477 U.S. at 252. To carry its ultimate burden of persuasion on the motion, the moving party must demonstrate that there is no genuine issue of material fact for trial. *Nissan Fire*, 210 F.3d at 1102; *Celotex Corp.*, 477 U.S. at 323.

A court presented with cross-motions for summary judgment should review each motion separately, giving the nonmoving party for each motion the benefit of all reasonable inferences from the record. *Ctr. for Bio-Ethical Reform, Inc. v. L.A. Cnty. Sheriff Dep't.*, 533 F.3d 780, 786 (9th Cir. 2008).

### B. Standard for Insurance Coverage Interpretation

Under California law, "[t]he burden is on the insured to establish that the occurrence forming the basis of its claim is within the basic scope of insurance coverage." *Aydin Corp. v. First State Ins. Co.*, 959 P.2d 1213, 1215 (Cal. 1998). Thereafter, once the showing has been made, the burden is on the insurer to prove a claim is specifically excluded." *Garvey v. State Farm Fire & Cas. Co.*, 770 P.2d 704, 710 (Cal. 1989).

## II.    Findings of Fact[1]

### A. JM Eagle's Plastic Pipe Business

JM Eagle is the world's largest manufacturer of high-grade, high-performance plastic pipes. AFM SUF ¶ 1. Among other products, JM Eagle manufactures polyethylene ("PE") and polyvinyl chloride ("PVC") pipes at various production facilities located throughout the United States,

---

[1] The facts set forth below are taken from the parties' prepared Statements of Uncontroverted Material Facts, ECF Nos. 133 ("AFM SUF"); 148-1, at 2 ("AFM SUF Opp'n"); 148-1, at 79 ("JME SAF"); 158-1 ("JME SAF Opp'n"); 138-9 ("JME SUF"); 142, at 2 ("JME SUF Opp'n"), 142, at 22 ("AFM SAF"), 166 ("AFM SAF Opp'n"). To the extent that any statements of fact are omitted, the Court concludes they are not material to the disposition of this Motion.

including one in Wharton, Texas. *Id.* ¶ 2. JM Eagle purchases resins from third-party suppliers for use as a raw material in the production of its plastic pipes. *Id.* ¶ 3.

### B.  JM Eagle's "All Risk" Policy

AFM sold JM Eagle AFM Policy No. SX459 (the "Policy") for the policy term of November 1, 2016, to November 1, 2017. JME SUF ¶ 1. The Policy is an "all risk" property insurance policy that covers "ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as [] excluded." *Id.* ¶ 2. Among other things, the Policy insures JM Eagle's interests in real and personal property at its facility located at 10807 US 59 Road, Wharton, Texas (the "Wharton Facility"). *Id.* ¶ 3. The Policy insures against certain economic losses that can result from physical loss or damage, including through the Policy's "Business Interruption Coverage" and "Business Interruption Coverage Extensions." *Id.* ¶ 4. The Policy provides that AFM's

> total limit of liability, including any insured Business Interruption loss, will not exceed the Policy Limit of $150,000,000 as a result of any one occurrence subject to the respective sub-limits of liability shown elsewhere in this Policy.

*Id.* ¶ 7.

### i.   The Policy's Supply Chain Coverage

The Policy provides coverage for "Supply Chain" losses suffered by JM Eagle. *Id.* ¶ 5. The Policy's Supply Chain coverage states as follows:

> This Policy **covers the Business Interruption Coverage loss** incurred by the Insured during the Period of Liability directly resulting from physical loss or damage of the type insured to property of the type insured at the premises of any of the following within the Policy's Territory:
>
> a) **Direct suppliers**, direct customers or direct contract service providers to the Insured;
>
> b) Any company under any royalty, licensing fee or commission agreement with the Insured; or
>
> c) **Any company that is a direct or indirect supplier**, customer or contract service provider of those described in a above,
>
> . . .

Business Interruption Coverage loss recoverable under this Business Interruption Coverage Extension is extended to include the following Business Interruption Coverage Extensions.

. . .

    f) Supply Chain

JME SUF ¶ 6 (emphasis added).

    ii.   The Policy's Sub-limits of Liability

The AFM policy also included several sub-limits of liability as follows:

F. SUB-LIMITS:

Unless otherwise stated below or elsewhere in this Policy, the following sub-limits of liability, including any insured Business Interruption loss, **will be the maximum payable and will apply on a per occurrence basis**.

. . .

2. $25,000,000 Flood annual aggregate for all coverages provided, and is the maximum amount payable for all loss or damage caused by or resulting from Flood in any occurrence, not to exceed:

**$5,000,000 Flood annual aggregate for all coverages** provided at the following location(s):

. . .

    **23. 10807 US 59 Road, Wharton, TX, 77488**

. . .

**$50,000 Flood annual aggregate as respects Errors & Omissions, Off-Premises Service Interruption, Unnamed Locations and Supply Chain combined**.

3. **$9,070,500 Business Interruption** at Location 1: **5200 West Century Boulevard**, Los Angeles, CA, 90045 **not to exceed**:

**$2,000,000 Business Interruption at all other locations**.

. . .

Business Interruption Coverage Extensions

. . .

**$2,500,000 Supply Chain**

AFM SUF ¶ 17 (emphasis added); JME SUF ¶¶ 12–13 (emphasis added); *see also* Policy, ECF No. 131-4, at 30–32.

### iii.   The Policy's Wind and Hail Deductible

The Policy imposes a "Wind and Hail" deductible for certain losses and damage at the Wharton Facility. AFM SUF ¶ 17. The Policy provision imposing the "Wind and Hail" deductible states:

> Wind and Hail (for all coverages provided in this policy) at the following location:
>
> 10807 US 59 Road, Wharton, TX 77488
>
> This company **will not be liable for loss to insured property unless the amount of loss or damage exceeds 2% of the combined value of property at the location where loss or damage occurs**, in accordance with the valuation section of this policy and annual business interruption value at the location where loss or damage occurs, in accordance with the Business Interruption Endorsement attached to this policy at the time such loss or damage at the location where loss occurs, subject to a minimum deductible amount of $100,000 per location. If coverage is provided for more than one location, this deductible percentage or minimum deductible amount will be calculated for and applied separately to each location.

*Id.* ¶ 18. The Policy further states:

> 3. Application of Flood and Wind and/or Hail Deductibles
>
> **If an occurrence involves loss or damage caused by or resulting from both:**
>
> **a. Wind and/or hail; and**
>
> **b. Flood; Then:**
>
> > **1) A specific wind and/or hail deductible; and**
> >
> > **2) A specific flood deductible; Will apply separately to each location.**

AFM SAF ¶ 1 (emphasis added).

### C.   JM Eagle's Claimed Business Interruption Losses at the Wharton Facility as a Result of Hurricane Harvey

In August 2017, Hurricane Harvey made landfall in Texas. *Id.* ¶ 4. JM Eagle's manufacturing facility in Wharton, Texas sustained physical damage as a result of Hurricane Harvey. *Id.* ¶ 5. JM Eagle alleges that it sustained at least $13,780,000 in Business Interruption

losses as a result of disruptions caused by the physical damage to the Wharton facility. *Id.* ¶ 6. AFM has paid JM Eagle the $5,000,000 annual aggregate flood sub-limit of liability for property damage and business interruption at Wharton. *Id.* ¶ 7. JM Eagle alleges that AFM still owes $2,000,000 in Business Interruption losses as a result of disruptions caused by physical damage to the Wharton facility because (1) the $2,000,000 Business Interruption sub-limit provides for up to $2,000,000 in Business Interruption coverage for each "occurrence" of physical loss or damage, and (2) the physical damage resulted from two temporally distinct events and, thus, two separate "occurrences." *Id.* ¶ 8. JM Eagle submitted a claim to AFM seeking insurance coverage for damage sustained at the Wharton Facility during and after Hurricane Harvey. *Id.* ¶ 20. JM Eagle's manufacturing capabilities at the Wharton Facility were impaired for several months following the hurricane. *Id.* ¶ 28.

### D.  JM Eagle's Claimed Supply Chain Losses as a Result of Hurricane Harvey

JM Eagle also asserts that seven of its resin suppliers located in Texas and Louisiana suffered physical damage or were otherwise impacted by Hurricane Harvey. *Id.* ¶ 9. JM Eagle alleges that it suffered approximately $17.99 million in losses as a result of the inability of seven of JM Eagle's resin suppliers to timely supply adequate amounts of resin in August, September, and October 2017 to some of JM Eagle's manufacturing plants. *Id.* ¶ 10.

### III.   Discussion

JM Eagle contends that it is entitled to partial summary judgment as to: (1) AFM's third affirmative defense regarding the "Wind and Hail" deductible; and (2) its assertion that its claimed supply chain losses are subject to the $2,500,000 Supply Chain Sub-limit Per Occurrence, not the Policy's $2,000,000 "Other Location" Sub-limit for business interruption losses. JME Mot. at 14–30. AFM contends that partial summary judgment is appropriate on: (1) JM Eagle's Supply Chain Claim; (2) JM Eagle's Bad Faith Claim; and (3) JM Eagle's punitive damages claim. The Court will address each of the motions in turn. In the case before us, JM Eagle has the ultimate burden of persuasion at trial on each of its claims. In both JM Eagle's and AFM's Motions for Summary Judgment, AFM has the initial burden of production and ultimate burden of persuasion.

### A. JM Eagle Motion

> i. JM Eagle is not entitled to partial summary judgment on AFM's third affirmative defense regarding the "Wind and Hail" deductible.

AFM's third affirmative defense asserts that JM Eagle's "claims are barred or limited in whole or part" by the "Wind and Hail" deductible, which amounts to 2% of the combined value of the property at the Wharton Facility. ECF No. 115 ("Answer") at 12–13. JM Eagle contends that AFM's third affirmative defense is untenable because (1) at best, the scope of the "Wind and Hail" deductible is ambiguous, JME Mot. at 16–18, and (2) AFM's expert evidence establishes that the deductible cannot potentially apply to any damage inside the buildings at Wharton, JME Mot. at 14. JM Eagle asserts that instead, the $50,000 "All Other Losses" deductible must govern the damage the occurred inside the Wharton Facility buildings. *Id.* at 18. In response, AFM contends that JM Eagle's arguments should be rejected because they are nearly identical to the arguments made in JM Eagle's original Motion for Summary Judgment. JME Opp'n at 8–10; *see also* ECF No. 37-1, at 22–24.

A motion for reconsideration "may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation." *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000). Additionally, the Ninth Circuit has established that "a court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case." *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir.), *cert. denied*, 508 U.S. 951 (1993).

Judge Holcomb's previous Order found that the Wind and Hail deductible applies in situations, as here, where "there is damage caused by wind, rain, *or* wind and rain together." MSJ Order at 12 (emphasis added). JM Eagle presents no evidence to the Court suggesting that the evidence it now offers—in support of the argument that the Wind and Hail deductible is ambiguous or does not apply—could not have been reasonably raised in their prior Motion for Summary Judgment.[2] Absent a showing from the parties that there exists new information in the moving

---

[2] The Court notes that JM Eagle previously had the opportunity to request reconsideration of this issue but declined to do so. Rather, in its previous Motion for Reconsideration, JM Eagle only raised issues concerning its bad faith and punitive damages claims. *See generally* Reconsideration Mot.

papers that could not have reasonably been presented in the first MSJ, the Court is constrained to rule consistently with Judge Holcomb's ruling and, therefore, DENIES JM Eagle's Motion for Partial Summary Judgment as to the "Wind and Hail" deductible.

      ii.  <ins>JM Eagle is not entitled to partial summary judgment with respect to the sub-limit applicable to its claimed supply chain losses.</ins>

      In its Motion for Partial Summary Judgment, JM Eagle argues that its claimed supply chain losses are subject to the $2,500,000 Supply Chain sub-limit per occurrence, not the Policy's $2,000,000 "Other Location" sub-limit for business interruption losses. JME Mot. at 24–30. As with JM Eagle's first argument regarding the "Wind and Hail" deductible, Judge Holcomb previously considered the issue presented. In his MSJ Order, he concluded that the Supply Chain coverage would be capped at $2,000,000 if the losses were attributed to a facility other than the company's Los Angeles headquarters or, alternatively, would be capped at $2,500,000 if the losses were attributed to the headquarters. MSJ Order at 18. However, he made no ruling as to which facility the supply chain losses should be attributed. *Id.*

      JM Eagle's complaint notes that its supply chain losses were recognized "on a company-wide basis," and, as a result, should be allocated to JM Eagle's Los Angeles headquarters. JME Mot. at 12 (citing SAC ¶ 22). JM Eagle has therefore met its initial burden of production. The burden now shifts to AFM to demonstrate the existence of a genuine dispute of material fact. AFM, in response, contends that JM Eagle's own expert attributes the claimed supply chain loss to locations other than headquarters, suggesting that at a minimum there is a genuine issue of material fact that precludes summary judgment on this issue. JME Mot. Opp'n at 19. As Judge Holcomb recognized in his prior order, the Policy itself provides no indication regarding how to properly determine to which location—either the Los Angeles headquarters or another JM Eagle facility—supply chain losses should be attributed. As a result, it appears that a genuine dispute of material fact exists as to which sub-limit applies. The Court therefore DENIES JM Eagle's Motion for Partial Summary Judgment as to the sub-limit applicable to its supply chain losses. As discussed below, however, the Court grants AFM's motion with respect to the Supply Chain claim, thereby rendering the allocation issue MOOT.

**B.  AFM Motion**

i.  <u>AFM is entitled to summary judgment with respect to JM Eagle's Supply Chain claim.</u>

The Policy's Supply Chain coverage "covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability directly resulting from physical loss or damage of the type insured to property . . . at the premises of" suppliers. AFM SUF ¶ 15.

AFM contends that it is entitled to summary judgment with respect to JM Eagle's supply chain claim because (1) JM Eagle has failed to establish the existence of a genuine dispute of material fact with respect to physical loss or damage for four of its resin suppliers: Dow Chemical Company ("Dow"), Chevron Phillips Chemical Company ("CPChem"), OxyVinyls, LP ("OxyVinyls"), or Westlake Chemical Corporation/Axiall Corporation ("Westlake"), and (2) the $50,000 annual aggregate sub-limit for flood limits any recovery JM Eagle could establish for the remaining providers Shintech Inc. ("Shintech"), INEOS Olefins & Polymers USA ("INEOS"), and LyondellBasell Industries ("LBI"). AFM Mot. at 16–21.

*1.  JM Eagle has failed to establish the existence of a genuine dispute of material fact with respect to physical loss or damage at Dow, CPChem, OxyVinyls, or Westlake.*

AFM argues that it is entitled to summary judgment on JM Eagle's Supply Chain claim in part because JM Eagle has failed to establish the existence of a genuine dispute of material fact with respect to physical loss or damage at a number of its suppliers—in particular, Dow, CP Chem, OxyVinyls, and Westlake. Mot. at 16–19.

a.  JM Eagle failed to establish a genuine dispute of material fact with respect to physical loss or damage at Dow.

With respect to Dow, AFM cites to (1) testimony by a Dow representative that its facility sustained no physical loss or damage or other covered impact associated with Harvey, AFM Mot. at 17 (citing Deposition Transcript of Matthew Schaar ("Schaar Dep. Tr."), ECF No. 131-10, at 19:18–45:5), and (2) testimony from JM Eagle's Vice President of Purchasing and Special Assistant to the President, Barry Lin, that Dow reduced its supply to JM Eagle prior to Harvey because its inventory

was oversold, AFM Mot. at 17 (citing Declaration of Barry Lin ("Lin Decl."), ECF No. 148-4, ¶ 3). AFM has therefore met its initial burden of production in demonstrating the absence of evidence supporting JM Eagle's Supply Chain claim with respect to Dow.

The burden now shifts to JM Eagle to demonstrate the existence of a genuine dispute of material fact. As discussed previously, under California law, "the burden is on the insured to establish that the occurrence forming the basis of its claim is within the basic scope of insurance coverage." *Aydin Corp.*, 959 P.2d at 1215. JM Eagle contends that "AFM understood that Hurricane Harvey substantially disrupted the resin supply market and was aware of specific Harvey-related impacts suffered by certain of JM Eagle's resin suppliers," including Dow. AFM Mot. Opp'n at 28 (citing Declaration of Kayla Robinson ("Robinson Decl."), ECF No. 145-3, Ex. 3 )). However, the evidence to which JM Eagle cites—a document concerning another insured's Hurricane Harvey claim, vaguely states that "On August 29, 2017, several [redacted] raw material supplier locations were impacted by Hurricane Harvey. Several locations sustained physical damage." Robinson Decl., Ex. 3. JM Eagle further contends that certain shipments from Dow were delayed for an unidentified length of time, for unidentified reasons. Lin Decl. ¶ 3. The Court finds that the evidence provided by JM Eagle is insufficient to demonstrate that a genuine dispute of material fact exists. For one, the document referenced by JM Eagle does not state anywhere that *Dow* was impacted by physical loss or damage as a result of Hurricane Harvey. Moreover, a declaration noting shipping delays from Dow does not necessarily indicate that Dow suffered physical loss or damage caused by Harvey— indeed, delays presumably occur at various times for a myriad of reasons other than hurricane- induced physical losses or damage. There is no evidence in the record that *these* delays were attributed to any physical losses or damage caused by Harvey.

          b.   JM Eagle failed to establish a genuine dispute of material fact with respect to physical loss or damage at CPChem.

With respect to CPChem, AFM notes that despite JM Eagle's assertions of delayed post- Harvey resin shipments, JM Eagle has failed to provide any evidence that such delays were caused by physical loss or damage from Harvey. AFM Mot. at 8–9, 18. Rather, AFM notes that the facility responsible for supplying JM Eagle did not experience any physical damage, nor did Harvey

1  interrupt its supply; in fact, CPChem's supply to JM Eagle increased from 250,000 pounds per
2  month to over 2 million pounds/month following Harvey. *Id.* at 18 (citing Affidavit of Edward G.
3  Harding, ECF No. 131-11 ("Harding Aff.")). AFM has therefore met its initial burden of production
4  in demonstrating the absence of evidence supporting JM Eagle's Supply Chain claim with respect to
5  CPChem.

6          The burden now shifts to JM Eagle to demonstrate the existence of a genuine dispute of
7  material fact. JM Eagle contends that "AFM understood that Hurricane Harvey substantially
8  disrupted the resin supply market and was aware of specific Harvey-related impacts suffered by
9  certain of JM Eagle's resin suppliers," including CPChem. AFM Mot. Opp'n at 28 (citing Robinson
10  Decl., Ex. 3). In support of this contention, JM Eagle cites to the same document it references in
11  support of its claim regarding Dow. *See id.*, Ex. 3. JM Eagle also asserts that several post-Harvey
12  shipments from CPChem were delayed. Declaration of Barry Lin, ECF No. 138-7 ("Lin Decl.") ¶¶
13  3–4. As with Dow, this document does not state anywhere that *CPChem* was impacted by physical
14  loss or damage as a result of Hurricane Harvey. Moreover, a declaration noting shipping delays from
15  CPChem does not necessarily indicate that CPChem suffered physical loss or damage caused by
16  Harvey. Just as with the alleged Dow delays, there is no evidence in the record that *these* delays
17  were attributed to any physical losses or damage caused by Harvey.

18                          c.   JM Eagle failed to establish a genuine dispute of material fact
19                               with respect to physical loss or damage at OxyVinyls.

20          With respect to OxyVinyls, AFM argues that JM Eagle has also failed to provide any
21  evidence that OxyVinyls's supply of resin to JM Eagle was impacted by physical loss or damage
22  from Harvey. AFM Mot. at 9–10. In support of this contention, AFM cites to testimony from
23  OxyVinyls's representative, who testified that Harvey "did not impair OxyVinyls's ability to ship
24  resins to JM Eagle during the August to November 2017 timeframe." *Id.* at 9 (quoting Deposition of
25  Jeremy Burnell ("Burnell Dep. Tr."), ECF No. 131-18, at 13:5–9). AFM has therefore met its initial
26  burden of production in demonstrating the absence of evidence supporting JM Eagle's Supply Chain
27  claim with respect to OxyVinyls.

28

The burden now shifts to JM Eagle to demonstrate the existence of a genuine dispute of material fact. Although JM Eagle contends that the OxyVinyls shipments were delayed, Lin Decl. ¶ 9, as with Dow and CPChem, it presents no evidence that such delays were attributed to any physical loses or damage caused by Harvey.

>    d.   JM Eagle failed to establish a genuine dispute of material fact
>         with respect to physical loss or damage at Westlake.

Lastly, with respect to Westlake, AFM argues that JM Eagle has also failed to provide any evidence that Westlake's supply of resin to JM Eagle was impacted by physical loss or damage from Harvey. AFM Mot. at 19. In support of this contention, AFM notes that Westlake confirmed that there was no physical damage to Westlake's facility and no impact on Westlake's ability to produce resin. *Id.*; *see also* Email from John Hensler ("Hensler Email"), ECF No. 131-28, at 3. Moreover, JM Eagle's own representative testified that it received the resin it needed following Harvey. Deposition of Barry Lin ("Lin Dep. Tr."), ECF No. 131-9, at 157:15–17 (testifying that Westlake did not "reduce the quantity it supplied to JM Eagle after Hurricane Harvey"). Although Westlake noted that it experienced difficulty obtaining some materials required to produce PVC as a result of Harvey, it ultimately made clear that it was able provide all of the PVC JM Eagle ordered from August to October 2017. Hensler Email at 3. AFM has therefore met its initial burden of production in demonstrating the absence of evidence supporting JM Eagle's Supply Chain claim with respect to Westlake.

The burden now shifts to JM Eagle to demonstrate the existence of a genuine dispute of material fact. Although JM Eagle contends that the Westlake shipments were delayed, Lin Decl. ¶ 9, as with the previously discussed suppliers, JM Eagle presents no evidence that such delays were attributed to any physical loses or damage caused by Harvey.

As a result, the Court finds that JM Eagle has failed to establish the existence of a genuine dispute of material fact with respect to physical loss or damage at Dow, CPChem, OxyVinyls, or Westlake.

/ / /

/ / /

> 2. *The $50,000 annual aggregate sub-limit for flood limits any recovery*
> *JM Eagle could establish for losses attributed to the remaining*
> *suppliers Shintech, INEOS, and LBI.*

AFM further contends that, with respect to the remaining suppliers—Shintech,  INEOS, and LBI—the $50,000 annual aggregate sub-limit for flood limits the amount of damages recoverable for Supply Chain damages. JM Eagle argues that AFM has failed to establish that any of JM Eagle's Supply Chain damages are subject to the $50,000 flood sub-limit because a genuine dispute of material fact exists as to whether the damage was caused instead by other forces, specifically rainfall during Hurricane Harvey. AFM Mot. Opp'n at 15–20. The parties therefore appear to disagree with respect to (1) whether Hurricane Harvey's disruption to seven suppliers should be considered one occurrence or seven, and (2) whether the $50,000 flood sub-limit applies to JM Eagle's supply chain claim.

The Court again notes that Judge Holcomb previously addressed both of these questions in his prior MSJ Order. The MSJ Order states, in relevant part:

> **JM Eagle has not proffered facts from which a jury could conclude that it is**
> **reasonable to understand each resin plant's disruption as a discrete event.** JM
> Eagle has claimed that LyondellBasell shut down "[d]uring Hurricane Harvey" because
> it was inundated with rain; that the Cedar Bayou plant suffered flooding "[d]uring
> Hurricane Harvey"; that the INEOS plant was inaccessible "for six days during and
> after Harvey"; and that Shintech was unable to ship resin due to unspecified hurricane
> damage to its rail infrastructure. In other words, where the two events (i.e., a hurricane
> and a flood) that occurred at JM Eagle's factory were discrete—in the sense of being
> two different events separated by an intervening time period—**the purported**
> **disruptions to JM Eagle's supply chain were not temporally separate.  Rather,**
> **they were part of the general maelstrom of chaos that Harvey inflicted upon Texas**
> **and Louisiana.**

MSJ Order at 15 (emphasis added). Judge Holcomb ultimately concluded that the damages, including flood damage, suffered by the remaining suppliers, Shintech, INEOS, and LBI, were due to one occurrence—Hurricane Harvey. *Id.*

Here, the Court finds that neither party, in the briefing on the renewed Motion for Summary Judgment, has presented new evidence to warrant a departure from Judge Holcomb's initial MSJ Order, which concluded that the damage suffered by the suppliers was due to one occurrence,

1    *flooding* by rain caused by Hurricane Harvey. As a result, the Court hereby GRANTS AFM's

2    Motion for Summary Judgment with respect to JM Eagle's Supply Chain claim.

3                    ii.   <u>AFM is not entitled to summary judgment with respect to JM Eagle's Bad</u>
                          <u>Faith claim.</u>
4

5          AFM further requests summary judgment with respect to JM Eagle's bad faith claim. AFM

6    Mot. at 21. JM Eagle alleges that AFM acted in bad faith by (1) unreasonably relying on forensic

7    account expert Conrad Biegel of Matson Driscoll & Damico ("MDD")'s revised expert opinions

8    with respect to JM Eagle's claimed business interruption loss for the Wharton claim, and (2)

9    unreasonably investigating, handling, and adjusting JM Eagle's claimed supply chain losses,

10   particularly by concluding that JM Eagle failed to satisfy the requirements for Supply Chain

11   coverage. *See generally* Amend. Bad Faith Stip. Order (identifying live issues raised by JM Eagle's

12   bad faith claim).

13         "In order to establish a breach of the implied covenant of good faith and fair dealing under

14   California law, a plaintiff must show: (1) benefits due under the policy were withheld; and (2) the

15   reason for withholding benefits was unreasonable or without proper cause." *Guebara v. Allstate Ins.*

16   *Co.*, 237 F.3d 987, 992 (9th Cir. 2001) (citing *Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1151

17   (1990)). A court can decide such a claim on summary judgment if it "can conclude as a matter of

18   law that an insurer's denial of a claim is not unreasonable, so long as there existed a genuine issue as

19   to the insurer's liability." *Lunsford v. Am. Guarantee & Liab. Ins. Co.*, 18 F.3d 653, 656 (9th Cir.

20   1994) (citing *Franceschi v. American Motorists Ins. Co.*, 852 F.2d 1217, 1220 (9th Cir.1988)).

21   Alternatively, an insurer is liable for breach of the implied covenant of good faith and fair dealing if

22   it acted unreasonably in denying coverage. *Guebara*, 237 F.3d at 992. Because establishing a breach

23   of the implied covenant of good faith and fair dealing requires showing that benefits have been

24   withheld, such a claim is not typically made until an insurer has taken a coverage position. *See, e.g.*,

25   *Fleming v. Safeco Ins. Co.*, 206 Cal. Rptr. 313, 315 (Ct. App. 1984) (plaintiff asserted bad faith

26   claim after insurer had taken coverage position).

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> 1. *A genuine dispute of material fact exists as to whether AFM acted in bad faith by unreasonably relying on MDD's revised expert opinions with respect to JM Eagle's claimed business interruption loss for the Wharton claim.*

AFM argues that it is entitled to summary judgment on the first bad faith claim that the parties articulated in the Amended Stipulation—that AFM acted in bad faith by unreasonably relying on MDD's revised expert opinion with respect to JM eagle's claimed business interruption loss for the Wharton claim—because the revised MDD opinion being complained of did not limit AFM's payment to JM Eagle. AFM Mot. at 22. AFM makes a number of contentions in support of this argument, all of which fail. According to AFM, JM Eagle was paid the entire annual aggregate sub-limit for flood of $5,000,000, an amount that included the $697,120 in business interruption losses identified in the initial MDD opinion. *Id.* And even though the revised—and complained of—opinion estimated JM Eagle's business losses at $0, AFM did not seek to recoup the prior payment. *Id.* As a result, AFM argues, JM Eagle cannot argue that MDD's revised opinion led to any withholding. *Id.* Furthermore, AFM contends, because of the application of the $5,000,000 flood sub-limit, even if JM Eagle did incur any additional losses, it was not entitled to any additional payment. *Id.*

There are three major problems with this line of reasoning: First, the documents cited to by AFM do not actually establish that there is no genuine issue of material fact with respect to the existence of the $697,120 payment. Those documents do not indicate, as AFM claims, that the $5,000,000 payment included all of the $697,120 payment. As a result, it is not beyond dispute that even the $697,120 has been paid. Second, AFM *did* rely on the revised opinion to determine that it would not pay any more for Business Interruption—it relied on the revised opinion to determine that there had been an overpayment and that nothing more would be due. *Id.* And third, AFM appears to argue that because of the $5,000,000 sub-limit, JM Eagle could not have received any more than the $697,120 as a result of the revised opinion in any event. *Id.* But as JM Eagle points out, the $5,000,000 sub-limit applies only to flood-related business interruption losses, not wind and/or rain-related losses. AFM Mot. Opp'n at 17. In response to this, and contradicting itself, AFM then argues that the $697,120 was not allocated between flood and wind/rain. AFM Mot. Reply at 11–12. But if

it was not so allocated, how can AFM claim that the total losses incurred by JM Eagle were all subject to and paid out under the $5,000,000 flood sub-limit?

In its opening brief, AFM states the following: "Indeed, AFM had already paid the entire $5 million sub-limit for flood relating to the Wharton facility, and AFM used its prior business interruption measurement of $697,120 in that payment." AFM Mot. at 22. But in its Reply, it appears to reverse course:

> . . . JM Eagle contends that AFM's prior payment of MDD's original loss measurement to JM Eagle "only purported to compensate JM Eagle's 'Flood' losses" and not losses related to wind or rain. Thus, according to JM Eagle, AFM is relying on MDD's revised opinion to withhold policy benefits for alleged wind and rain losses.
>
> But not so. MDD's original measurement of "substantial business interruption losses" did not distinguish between "flood" and non-flood losses. Instead, it was a measurement of *all* Hurricane Harvey-related business interruption losses at the Wharton facility. Again, AFM has paid JM Eagle the entirety of MDD's original loss measurement and, thus, it is not withholding any policy benefits as a result of MDD's revised opinion.

Reply at 11–12 (citations omitted).

But herein lies the fallacy: AFM relied on the $5,000,0000 flood sub-limit, or the revised opinion, or both in determining that it would not pay any more than the $697,120 allegedly already paid. For instance, if the flood sub-limit had been significantly higher, and MDD's revised opinion had calculated the business interruption losses at greater than $697,120, AFM would have presumably paid more to JM Eagle. Similarly, even if the flood sub-limit had not been higher, but MDD's revised opinion had determined that some of the $697,120 in previously calculated losses were actually attributable to wind and rain and therefore not subject to the $5,000,000 limit applied, then AFM would have presumably paid more to JM Eagle for damages resulting from wind and rain, assuming there was additional room under that sub-limit. Therefore, the fact that the revised opinion did not yield a loss number greater than $697,120 and did not counsel a different flood/non-flood allocation of the $697,120 was relied upon by AFM in refusing to pay anything additional to JM Eagle. Perhaps recognizing this vulnerability, AFM states in a footnote:

> JM Eagle also fails to acknowledge that AFM ultimately allocated the entirety of its business interruption measurement as part of the flood loss, because JM Eagle had

not sustained non-flood loss in excess of the applicable wind and rain deductible, which is over $2.3 million dollars.

*Id.* at 12 n.3. This is contradictory and circular. JM Eagle took pains to point out that the original calculation was not allocated between flood and non-flood. So, if it was later fully allocated to flood, such allocation was not—according to AFM—in reliance on the original MDD opinion, leaving a genuine issue of material fact as to whether the payment was made in reliance on the revised—and complained-of—opinion.

AFM cannot establish the absence of a genuine issue of material fact with respect to bad faith reliance on the MDD revised opinion and the effect of that reliance. The Court therefore DENIES summary judgment on the Wharton Bad Faith Claim.

> *2.  Because the Court concluded that AFM is entitled to summary judgment with respect to JM Eagle's Supply Chain claim, the Court similarly finds that AFM is entitled to summary judgment with respect to JM Eagle's supply chain bad faith claim.*

AFM further argues that it is entitled to summary judgment with respect to JM Eagle's bad faith claim alleging that AFM unreasonably investigated, handled, and adjusted JM Eagle's claimed supply chain losses. *See generally* Amend. Bad Faith Stip. Order. As noted previously, the Court concluded that AFM was entitled to summary judgment with respect to JM Eagle's Supply Chain claim because (1) JM Eagle has failed to establish the existence of a genuine dispute of material fact with respect to physical loss or damage for four of its resin suppliers, and (2) the $50,000 annual aggregate sub-limit for flood limits any recovery JM Eagle could establish for the remaining providers. As a result, by definition, AFM could not have acted in bad faith by finding that JM Eagle failed to satisfy its requirements for Supply Chain coverage. The Court therefore GRANTS summary judgment on the Supply Chain Bad Faith Claim.

> iii.  <u>AFM is not entitled to summary judgment on JM Eagle's punitive damages claim.</u>

JM Eagle's punitive damages claim is based on its allegations that AFM acted in bad faith by (1) unreasonably relying on MDD's revised expert opinions with respect to JM Eagle's claimed business interruption loss for the Wharton claim, and (2) unreasonably investigating, handling, and

adjusting JM Eagle's claimed supply chain losses, particularly by concluding that JM Eagle failed to satisfy the requirements for Supply Chain coverage. *See* Amend. Bad Faith Stip. Order (identifying live issues raised by JM Eagle's bad faith claim). AFM contends that summary judgment is appropriate on JM Eagle's punitive damages claim because (1) JM Eagle cannot survive summary judgment on its bad faith claim, (2) the evidence demonstrates that there is a bona fide dispute over insurance coverage that precludes punitive damages as a matter of law, and (3) there is no evidence of any oppressive, fraudulent, or malicious conduct on AFM's part. Mot. at 24.

Punitive damages aren't available in California for simple breaches of contract, regardless of how willful. *Slottow v. Am. Cas. Co. of Reading, Pennsylvania*, 10 F.3d 1355, 1361 (9th Cir. 1993). "Rather, the breach must have been tortious, and the breaching party must have 'been guilty of oppression, fraud, or malice.'" *Id.* (quoting CAL. CIV. CODE § 3294). In other words, punitive damages are only recoverable where the defendant "act[ed] with the intent to vex, injure, or annoy." *Id.* (quoting *Neal v. Farmers Ins. Exch.*, 582 P.2d 980, 986 (Cal. 1978)). Moreover, without bad faith, there can be no punitive damages. *Id.* at 1362. Indeed, as the Ninth Circuit recognized,

> [d]isagreement over insurance coverage—so long as the issues disputed are bona fide—is an ordinary cost of doing business. Nothing in California law suggests a refusal to provide coverage as requested by an insured, when the refusal is supported by a reasonable, good faith argument, can form the basis for punitive damages.

*Id.* However, as discussed previously, the Court has concluded that a genuine dispute of material fact exists with respect to JM Eagle's Wharton Bad Faith claim. As a result, the Court finds AFM's contentions, regarding JM Eagle's punitive damages claim unavailing.

As a result, the Court hereby DENIES AFM's Motion for Summary Judgment as to the punitive damages claim.

## **CONCLUSION**

In light of the foregoing, the Court hereby ORDERS as follows:

1. JM Eagle's Request for Judicial Notice is GRANTED;

2. JM Eagle's Motion for Partial Summary Judgment is DENIED as to the "Wind and Hail" deductible;

3.   JM Eagle's Motion for Partial Summary Judgment is DENIED as to the sub-limit applicable to its claimed supply chain losses;

4.   AFM's Motion for Partial Summary Judgment is GRANTED as to JM Eagle's Supply Chain claim;

5.   AFM's Motion for Partial Summary Judgment is DENIED as to JM Eagle's Bad Faith claim; and

6.   AFM's Motion for Partial Summary Judgment is DENIED as to JM Eagle's punitive damages claim.

Dated: February 23, 2023

MAAME EWUSI-MENSAH FRIMPONG

United States District Judge